**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **No. 4:23-CR-00578-AGF** |
| | ) |
| | ) |
| **CONNIE BOBO,** | ) |
| | ) |
| **Defendant.** | ) |

**PRETRIAL CONFERENCE**

**BEFORE THE HONORABLE AUDREY G. FLEISSIG**
**UNITED STATES DISTRICT JUDGE**

**OCTOBER 9, 2025**

APPEARANCES:

For Plaintiff: Derek J. Wiseman, Esq.
                Jonathan A. Clow, Esq.
                OFFICE OF THE U.S. ATTORNEY
                111 South 10th Street, 20th Floor
                St. Louis, MO 63102

For Defendant: Katryna Lyn Spearman, Esq.
                LOWTHER WALKER, LLC
                101 Marietta Street NW, Suite 3650
                Atlanta, GA 30303

Reported By:   CARLA M. KLAUSTERMEIER, RMR, CRR, CRC, CCR
                Official Court Reporter
                United States District Court
                111 South 10th Street
                St. Louis, MO 63102 | (314)244-7984

PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

**(The proceedings commenced at 1:33 p.m.)**

**(The following proceedings were held in open court with the defendant present:)**

**THE COURT:**  Good afternoon.

**MR. WISEMAN:**  Good afternoon, Your Honor.

**MR. CLOW:**  Good afternoon.

**THE COURT:**  Okay.  Give me just a moment here.

All right.  We are here in the matter of the United States of America v. Connie Bobo.  It is Case No. 4:23-CR-578-AGF.

And the United States is represented by Assistant United States Attorneys, Jonathan Clow and Derek Wiseman.  And Ms. Bobo is present and represented by her attorney, Ms. Katryna Spearman.

This matter is scheduled before the Court today for a final pretrial conference.  Are the parties ready to proceed?

**MR. WISEMAN:**  We are, Your Honor.

**MS. SPEARMAN:**  Yes, Your Honor.

**THE COURT:**  All right.  So just to make sure I have seen what I have need to have seen, I have received two filings in the last few days.  One was the response to the United States' trial brief and motions *in limine* and that was filed by the defendant Tuesday?

**MS. SPEARMAN:**  Yes, Your Honor.

THE COURT:   And then I received, I believe, today, proposed supplemental jury examination questions for voir dire.

MS. SPEARMAN:   Yes, Your Honor.   And I hope that's --

THE COURT:   Is there anything else that the defendant has filed in the last few days?

MS. SPEARMAN:   No, Your Honor.   I apologize for interrupting.   I hope that's acceptable because I appreciated the Government's questions and we only had just those two supplemental questions.   So in the interest of efficiency, I didn't want to reproduce a full list.

THE COURT:   No, no, no, no.   That's fine.

All right.   And so just let me ask.   Is there anything in particular that we need to take up that you all are aware of before I start going through my housekeeping and other matters related to the trial?

MR. WISEMAN:   Not to my knowledge, Your Honor.

MS. SPEARMAN:   No, Your Honor.

THE COURT:   All right.   So let me just tell you one thing.   It is likely that I will start this case on Tuesday rather than Monday.   And the reason for that is that I had my final pretrial conference in the case that I am trying in Cape Girardeau next week.   I'm not -- because Monday's a holiday there, I'm not totally confident that we're going to

get done with that case in four days, and so I want to leave open the possibility that I could go back on Monday and complete that case if that's what I need to do.

Yes, ma'am.

**MS. SPEARMAN:** Will we have notice of that on Friday, Your Honor? Obviously, I need to travel in for the case.

**THE COURT:** No. We'll -- you'll get notice before that.

**MS. SPEARMAN:** Okay. Thank you.

**THE COURT:** So hopefully I will decide that today. So unless you all have some problems with that, that is probably the direction that we're going to go. Does anyone have a problem with that? I wouldn't have done that when you all were predicting that it was going to take us two weeks to try this case.

**MR. WISEMAN:** Yeah. Yeah.

**THE COURT:** But it's my understanding that you no longer believe that?

**MR. WISEMAN:** That is correct, Your Honor. And I'm confident we could still get this case done by Friday even if we start on Tuesday. And I'm going through my mental list of the witnesses' schedules. That won't be a problem if we start on Tuesday.

**THE COURT:** All right.

MS. SPEARMAN: I see no problem with that as well, Your Honor.

THE COURT: All right. So, you know, I hope to make that decision this afternoon, but if we run too late for that to happen this afternoon, then we will certainly make it first thing in the morning and let you know. Okay?

MS. SPEARMAN: Great.

THE COURT: All right. Because I didn't want to be in the position of first notifying you all on Friday that we weren't going to start on Monday. Didn't want to do that to the prospective jurors. Didn't want to do that to you. All right?

Okay. So I take it that the Government is still thinking that it can likely finish its case in four days?

MR. WISEMAN: Yes, Your Honor.

THE COURT: All right. And approximately how many witnesses do you have?

MR. WISEMAN: At this point, Your Honor, anywhere between 10 to 15 witnesses --

THE COURT: Okay.

MR. WISEMAN: -- is what we're estimating.

THE COURT: And approximately how long does the defendant think her case will take?

MS. SPEARMAN: Your Honor, we anticipate some relatively, potentially lengthy cross-examination of the

*Pretrial Conference*

6

Government's witnesses.  The only witness that we intend on calling at this point is Ms. Bobo.

THE COURT:  Okay.

MS. SPEARMAN:  So we don't anticipate a lengthy defense presentation, but I'm not sure if we're going to add to the Government -- to the length anticipated by the Government during their case-in-chief.

THE COURT:  All right.  Good.  Thank you.  So it is possible that even with the Tuesday start, we would finish this case on Monday or Tuesday?

MS. SPEARMAN:  Yes, Your Honor.

MR. WISEMAN:  Yes.

THE COURT:  All right.  Great.

Okay.  And let's talk about how many alternates, recognizing that we're talking about five to six days of trial.  How many alternates are you all looking for?

MR. WISEMAN:  Usually request two alternates, Your Honor, but I'm open to any other ideas.

MS. SPEARMAN:  I think two alternates should be sufficient, Your Honor.

THE COURT:  All right.  And that was what I was thinking as well.  So we are going to go with two alternates.

And in terms of daily times, we will usually go from 9:00 till 5:00.  We will take, you know, about an hour for lunch each day and we'll take about a 15-minute break in the

morning and in the afternoon.  I will tell the jurors that it's possible we could go a little bit late some nights if we're about to finish a witness.  But do those times pose any problem for anybody?

            **MR. WISEMAN:**  No, Your Honor.

            **MS. SPEARMAN:**  No, Your Honor.

            **THE COURT:**  All right.  And even though that would be the times when we are holding court, I would need you all here at 8:30 every day so that we can take care of any little matters we need to address before we get going each day.  Okay?

            **MR. WISEMAN:**  Okay.

            **THE COURT:**  And I -- have all motions *in limine* been filed?

            **MR. WISEMAN:**  Yes, Your Honor.

            **THE COURT:**  I did not see any motions *in limine* filed by the defendant; is that correct?

            **MS. SPEARMAN:**  Just responsive.

            **THE COURT:**  All right.  Good.  What I'm going to do now -- you all can sit down unless you don't want to.  So I'm just going to walk through with you, generally, how I conduct the trial and how I conduct voir dire.  But before we do that, let's just circle back very quickly.  I assume you all are not engaged in any further plea negotiations?

            **MR. WISEMAN:**  No, Your Honor.

*Pretrial Conference*                                              8

**MS. SPEARMAN:**  No, Your Honor.

**THE COURT:**  All right.  So let me just tell you. Obviously, that's a decision that you can change your mind on at any time.  But I won't be here next week.  All right?  I will be in Cape Girardeau trying a case.  And so, if you have differing thoughts about it and you think you might want to change your plea from not guilty to guilty, if it's possible to do that tomorrow, I will make myself available for that. But just know that if we're really trying to get this done before the trial, that would be the best day to do it.  If my trial finishes on Friday and we don't begin until Tuesday, obviously, that Monday would be available to us as well.

And understand, ma'am, I'm not trying to pressure you to enter into a plea.  I don't care one way or the other whether you enter into a guilty plea.  That is totally a decision for you to make.

So let's just kind of walk through how we are going to proceed.  First thing, obviously, we're going to do is pull in the jurors and seat them.  These jurors have been screened as to time.  We screened them with respect to their availability for a two-week period, and so, hopefully, we won't be getting a lot of strikes for cause based simply on unavailability.

Let me give you -- and this is the first time I've been in this courtroom for a trial.  I just changed -- moved

where I was in the courthouse.  But let me tell you what I'm currently thinking in terms of how the jurors would be seated and here is a chart for you.

Can you all take this, please, and hand it out to them?

**MR. WISEMAN:**  Thank you very much, Your Honor.

**MS. SPEARMAN:**  Thank you.

**THE COURT:**  So we would probably just use that middle bench.  We would seat the jurors, first, in the jury box, and then we would use the row -- that front row and then the rows behind.  Okay?

**MR. WISEMAN:**  All right.

**THE COURT:**  And is Ms. Bobo restrained in any fashion?

**MS. SPEARMAN:**  She is right now, Your Honor, and that was actually one thing that I was going to ask about.  Do you prefer a formal motion regarding both her wardrobe and her level of restraint or can we have a --

**THE COURT:**  No.  We can talk about that now.  And, certainly, there is no question as to wardrobe.  And I would not want Ms. Bobo appearing in court in her orange garb unless that's what she really, really, really wants to do.  So I'm hopeful that you will be arranging for street clothes to be brought --

**MS. SPEARMAN:**  Right.  We can have family bring in

street clothes?

THE COURT:  Absolutely.

MS. SPEARMAN:  Perfect.

THE COURT:  So please do because I would strongly prefer that Ms. Bobo appear in street clothes.  I will tell you that, typically, the marshals these days require some kind of restraint.  Do you have hand restraints there, ma'am?

MS. SPEARMAN:  She's fully shackled right now, Your Honor.

THE COURT:  All right.  So, generally, what we will do is -- first of all, you will be at that table instead of this table.  All right?  Because we will put the party with the burden of proof closest to the jury.  And so the Government -- I'll have you all swap your tables.  And then we would remove Ms. Bobo's hand restraints.  She would have only leg restraints.

We will put curtains up around the table so that both, on this side -- and, Kelley, we actually need to turn the corner there -- so we will have a drape put on the tables so that no one would be able to see any leg restraints.  And in the event that Ms. Bobo does choose to testify, and, obviously, that's a decision she can make -- she doesn't have to commit to it at this moment -- but if she does decide to testify, we would excuse the jury, place her on the witness stand, bring the jury back out, excuse the jury before she

leaves the witness stand so they would never see her in any form of restraint.

**MS. SPEARMAN:** Great. Thank you.

**THE COURT:** All right?

Okay. So, in any event, we -- the jurors go through orientation from 8:30 till 9:00. And then what will happen, I have requested that we have 42 jurors brought up here just based upon what we thought was the length of the trial at the time. And so, hopefully, we'll -- we don't always get 42 just because we think we're going to get 42, but we should assume that it's going to be somewhere between 40 and 42. Sometimes we get some extras, so there could be actually a couple more than 42. But that's how they would be seated. We would be using the middle section only. Okay?

And you will refer to jurors by their number and not their name. All right? So during the voir dire process, you won't be saying, Ms. Smith, I see X, Y, Z. You will refer to her as Juror No. 7. And they will each have their numbers on them and they will be seated as appears on this chart. So you should be able to make the connections that you need.

They will bring up a list of the jurors with some very, very basic, and I will say, minimal information about the jurors. So you will have their name, where they're working, how long they've been working there, whether they are a supervisor or not. I think sometimes we've got the spouse's

occupation as well, the general area in which they live.  It's not a lot of information.  It's a little bit of information.  And they will bring that list up to you.  You can review that list.  I'll give you a little bit of time to review the list and then we will seat the jurors.

I will have each juror seated individually.  We won't just say, Okay, you know, everyone -- 1 through 16, go sit there.  And that is to give you a moment to just view each prospective juror individually.  In case it's important to you how they're dressed or what they're carrying or anything else, that you will have a moment to do that.  It will also give you a little bit more time to look at the list if you want it.  Those lists will be returned to us at the end of voir dire.  And so then they will be seated and we will commence the process.

I will tell them a little bit about voir dire and its purpose, that it's just to learn a little bit more about their background and experiences so that we can determine whether there is anything about their background that might affect their ability to be fair and impartial.  I will tell them the questions are not meant to embarrass them, but we do need to have their full answers, that on rare occasions, a person may find it particularly difficult to answer a question in front of this large of an audience.  And if they have a need to keep their answer more private, then they can come up

and give it at the bench outside the hearing of others.

And then we will have the oath administered to them. And, generally, when we are posing voir dire questions, you are going to pose your questions to the group as a whole. Follow up to the extent that any of the jurors have indicated they have some positive or, you know, responsive answer to your question. So, in other words, you're not going to sidle up to the jury box and say, So, Juror No. 7, tell me what magazines you read. We are not doing that. All right? So you are going to pose general questions to them and then follow up to the extent they have something responsive.

In terms of the instructions, I am going to read Instruction .10. I am going to give them an explanation of the case. And one of the things I'm going to need from you all is a summary of the case. And I know the Government referenced for me the summary of the case that is included in your instructions. That will not fly.

**MR. WISEMAN:** Okay.

**THE COURT:** All right? No. We need something far more generic than that.

**MR. WISEMAN:** Okay.

**THE COURT:** We are not going to talk about Ms. Bobo lying on the summary that we have that's presented to the jury. So we need something much more generic.

**MR. WISEMAN:** Okay.

**THE COURT:** All right? And so I'm going to ask you all to work on a summary of the case that you can agree to that sets out the time period, the general nature of the charges, and, you know, to the extent a particular entity is involved, the entity that Ms. Bobo was involved with ought to be listed there. Because the purpose of this is to simply advise the jurors what is the nature of the case here, and also, to give them some very basic information so they can tell us whether they've got a conflict --

**MR. WISEMAN:** Perfect.

**THE COURT:** -- on the case. All right? And then it should say that, you know, those are the allegations and that Ms. Bobo, you know, has denied -- you know, has pleaded not guilty or, you know, denied whatever. I mean, you all can decide on your wording for it. And if you can't agree on one, then let me know and I will draft one.

So I will read them that summary. I will ask if anyone knows of that incident or those charges. I will introduce counsel. And so I will introduce each of you. I will ask you to please stand. Is there an attorney who's taking the lead in this case?

**MR. WISEMAN:** I'll be the lead counsel, Your Honor.

**THE COURT:** All right. So I will ask you to stand and introduce those at counsel table with you. Will you be having a government representative at counsel table with you?

MR. WISEMAN:  Yes, we will.  FBI Forensic Accountant Emily Scott.

THE COURT:  I'm sorry.  I --

MR. WISEMAN:  FBI Forensic Accountant Emily Scott.

THE COURT:  Okay.  Thank you.

And then I will ask you to stand and introduce Ms. Bobo.  Okay?

MS. SPEARMAN:  Yes, Your Honor.

THE COURT:  And I will ask whether any of the prospective jurors know any of you, the law firms, or had any dealings with the law firms to their knowledge.  I will ask whether any of them know one another.  And you will see that some of the questions I am asking are questions that were on the proposed voir dire list that was filed by the Government.  So I will ask whether any of them know one another and whether there's anything about that association that might make it difficult for them to sit together, can they exercise independent judgment.

I will tell them approximately how long we expect the case to take.  So are we saying six days?  What are we saying?  Five to six days?

MR. WISEMAN:  I think five to six days sounds safe, Your Honor.  Yeah.

MS. SPEARMAN:  I think five to six days sounds safe with the understanding amongst us here that it'll probably be

less.  But I think --

THE COURT:  Right.

MS. SPEARMAN:  -- telling the jury five to -- you know, if it's Tuesday to Tuesday, makes sense.

THE COURT:  All right.  So we're going to tell them about five to six days.  I will tell them that -- you know, we're usually -- what I told you, that we usually go from 9:00 to 5:00 and tell them about the breaks we take and ask, if given that schedule, there's anyone who would be unable to serve.

Now, I will tell you that on one of the days, I'm going to have to break court at 3:00 because I have to take some guilty pleas in a case and I have to have a quick hearing in another case.  So I think -- I don't remember if it's Wednesday or Thursday, but one of those days, I'm going to need to break court a little bit early.  And so I will ask them, having heard that schedule, whether there's anyone who would be unable to serve based on particular problems or important scheduling conflicts they could not reschedule, ask if anyone has any physical or medical problems or needs that we might need to accommodate such as medications at a certain time or I need to stand up and stretch my back, whatever.

And having asked that question, are there any accommodations that I need to make for any of you?

MR. WISEMAN:  Not from us, Your Honor.

**MS. SPEARMAN:**  No, Your Honor.

**THE COURT:**  All right.  Then I will ask them about their prior jury service.  I will ask that, kind of, one section or row at a time, ask if anyone's been selected as a juror, whether the case finished or not, where, when, was it civil or criminal, did they reach a verdict, were they the foreperson, and is there anything about that experience that might interfere with their ability to be fair and impartial in this case.  I will ask similar questions with respect to prior grand jury service.

I will ask whether they or any of their close friends or relatives have ever been arrested for or charged with a crime or placed on probation in state or federal court where the punishment was potentially one year or more.  If so, what was the offense.  And if it was someone else, do they feel that you or that other person were treated fairly, is there anything about that situation that might affect their ability to listen to the evidence, come to a fair decision in this case.

I will ask whether any of them or their close friends or relatives have ever been the victim of a crime, and if so, anything about that incident that would prevent them from being fair and impartial.  Depending upon what it is, I might ask them whether they thought the matter was handled in a satisfactory manner, whether they think that experience has

affected their opinion of the criminal justice system.

I will advise them of the presumption of innocence and ask if there's anyone who doesn't understand that a charge is not evidence and simply because a person has been charged is no evidence of guilt, advise them about the defendant being presumed innocent and that that presumption stays with them and that the obligation is always on the Government to prove guilt beyond a reasonable doubt, and ask if there is anyone on the panel who disagrees with that, and also ask if there's anyone would find Ms. Bobo not guilty even if convinced of her guilt beyond a reasonable doubt solely because they felt sympathy for her.

I will remind them that the burden of proof in a criminal case is different than in a civil case, and that the burden is on the Government to prove guilt beyond a reasonable doubt, ask if there's anyone who doesn't understand that it is different than in a civil case, ask if there is anyone who disagrees with that principle or thinks that the burden should be something different.

I will advise the jurors of Ms. Bobo's absolute right not to testify and ask if there is anyone who would be more likely to believe that she is guilty if she does not testify, and advise them that if she does not testify, they may not discuss that in their deliberations and ask if there's anyone who does not understand that or feels they would not be

able to abide by that directive.

I will discuss evidence and the law, that their job is to decide the case based on the evidence applying the law as I give it to them and that it is their duty to follow the law as I give it to them in my instructions, even if they disagree with it, and ask if there is anyone who would not be willing to follow all the instructions I give, and if there's anyone who would be unable to decide the case based solely on the evidence that's presented to them here in the courtroom.

And then I am going to read them a list of names. And this is another thing I need from you.  So I need that summary.  I also need a list of names of persons who may be called as witnesses or the names of persons or entities whose names may be featured in some meaningful way during the trial. So even if that person is not going to be a witness, if we're going to keep hearing their name or their name's going to come up in some material fashion, or if there are particular entities -- you know, I know there are a bunch of bank records and other things here, and so I need that full list.

Now, understand, I will not be suggesting to the jurors that all the names that they hear are going to be called as witnesses.  I will tell them I'm going to read them a list of potential witnesses as well as just names they may hear during the course of the trial to make sure that they don't know, work for, have some association with any of those

entities.  And so I need that list from you as well.  All right?  So, hopefully, I'm going to ask you to work on it together so that I don't have to take two separate lists and figure out where there is duplication.

**MR. WISEMAN:**  Your Honor, when would you like -- is the Friday before trial okay for the list of names and also the description of the indictment and the charges?

**THE COURT:**  Friday is fine if we're starting on Tuesday.

**MR. WISEMAN:**  Okay.

**THE COURT:**  All right.

And, Sara, are you listening?

Can you shoot Sara an e-mail and ask her if we're okay to start on Tuesday?

**THE CLERK:**  Yes.

**THE COURT:**  I will tell them that we are going to pick 12 jurors and two alternates.  That they're --

**THE CLERK:**  She said yes.

**THE COURT:**  All right.  So we're going to start on Tuesday, so Friday before trial will be fine both for your summary as well as the list of names.

I'm going to tell them that we're going to pick 12 jurors and two alternates, that their verdict must be unanimous, find out if anyone disagrees with that or feels that they will be unable or unwilling to try and reach a

unanimous verdict.  I will ask whether any of them have any concerns about anything that I haven't asked them, anything about their life experiences that might prevent them from being completely fair and impartial in this case.

And then I would plan to turn it over to you to ask your questions.  If either of you have objections to questions that aren't on my list -- well, if you have objections to things on my list, I want to hear that as well.  But if you have a problem with anything that has been filed by opposing counsel with respect to proposed voir dire questions, then I want you to get that on file by Friday as well.  All right?  I didn't see anything particularly objectionable about any of the questions that I saw, but I will let you make that decision for yourself.

You should plan on about 20 minutes per side. That's a guide.  I'm not going to stick a clock on you because, of course, we can never predict how many responses we're going to get to your questions or how long some jurors take to answer some of these questions.  And so I will then turn it over to the Government and then turn it over to Ms. Bobo for you all to conduct your voir dire.

You should plan on staying generally within this well.  You don't need to keep a hand on the podium at all times, but you should be staying generally in this central area.  Again, you are not going to sidle up to the jury box or

to the benches down there to ask your questions.  All right?

So any questions about just the examination process?

**MR. WISEMAN:**  Briefly, Your Honor.  So just so we're making sure we're clear on the rules, the only questions we're allowed to ask the panel members are the questions that we have filed; is that correct?

**THE COURT:**  No, no.  That's -- you're not only allowed to ask the questions that you have filed.

**MR. WISEMAN:**  Okay.

**THE COURT:**  Especially since you may come up with some new questions as we're going along.

**MR. WISEMAN:**  Based on -- okay.

**THE COURT:**  And so -- but if you are planning to ask anything that is likely to draw an objection from opposing counsel -- you're all experienced counsel.  You know what that looks like.

**MR. WISEMAN:**  Yes.

**THE COURT:**  All right?  If you are planning to ask any questions that are likely to draw an objection from opposing counsel, you must file that question.

**MR. WISEMAN:**  Absolutely.

**THE COURT:**  All right?

**MR. WISEMAN:**  The second question, Your Honor, I have is for silent panel members.  Are we allowed to -- and I know you said at the beginning that -- don't individually --

THE COURT:  Right.

MR. WISEMAN:  -- question panel members.  But if they are silent and haven't said anything, are we permitted to ask them a question based on the permissible questions we filed?

THE COURT:  Yeah.  And I should have mentioned that to you.  You know, especially with a panel this large, we always have some people who say nothing at all.  And so, what will happen is when you all have finished your questioning, I'm going to call you up here.  Actually, this is how you come up here.  And I'm sorry.  I'm still getting used to this courtroom.  So this is where you come up to speak to me at the bench.  I'm going to call you up to the bench.  I am going to tell you the jurors that I have on my list that I think have not said a word.  And at that point, I will give you two options.  You can direct some -- one of the questions that you have already asked to those jurors or -- and this is what it seems like most attorneys usually select -- I can ask them questions.

And so, if you want me to do it, I am likely going to look at that person and say, Now, Juror No. 7, we haven't heard anything from you and that's perfectly okay.  But I just want to make sure, you know, based upon what you have heard, is there anything that you have heard that gives you any concern about your ability to be completely fair and impartial

in this case?  And that will give us an opportunity to make sure that they can hear and speak, and also, that we don't have a juror who's going to respond and say, I don't believe in the court process and I don't plan to participate.  And that's only happened to me once, but it's a good thing to know.

So if you don't want to follow up and you don't want me to follow up, that's totally your choice.  But you don't need to take a bump on a log.  So you may follow up or I will follow up, at least with a question or two, to each juror who has not responded in any way.  Okay?

**MR. WISEMAN:**  That sounds great.  Thank you, Judge.

**THE COURT:**  All right.  And you can just tell me when you come up here.  I keep going here because that's where I was in my old courtroom, but it's actually here.  And you can tell me when I call you up which, you know, method you prefer.

And then we will recess to pick our jury.  We will send the jurors back down to the jury assembly room.  And we're going to tell them it's going to take about 30 minutes, but it always takes longer than that.  And then we will take up strikes for cause.  I am going to ask you -- both sides to give me all of their strikes for cause before I begin to rule on them because, often, you are in agreement with respect to several of them.

And so, then I will hear you on strikes for cause. And after we have the strikes for cause, then you may go and work on your peremptory strikes. And, basically, what you're going to do with respect to your peremptory strikes, the defendant is going to get 10, the Government's going to get 6. And what's going to happen with respect to your peremptory strikes is that you're going to exercise them from what we need -- just from those that we need. All right?

So we need 12 plus two. Right? And so that is 14. And then you're going to exercise your peremptory strikes, which is 16. So, basically, you're going to exercise those strikes for the main jurors out of the first 28, but then I'm going to give you each one more with respect to the alternates. Does that make sense to you?

**MS. SPEARMAN:** Yes.

**MR. WISEMAN:** Yes, Judge.

**THE COURT:** So if we end up with 34 jurors actually coming on, you may never need to be considering Jurors, you know, 28 through 34. I don't know. It depends how many strikes for cause we have. All right? Does everybody understand what we're saying here?

**MR. WISEMAN:** It does, Your Honor. Do we make our strikes in alternating fashion? How do you prefer we do that?

**THE COURT:** No.

**MR. WISEMAN:** Okay.

**THE COURT:**  I know.  No.  I give the defendant a little advantage here.  And so the Government will exercise its 6 peremptory strikes, give that to the defendant, and then the defendant will exercise their 10.

**MR. WISEMAN:**  That works for us.

**THE COURT:**  I know.  I know.  Not everyone does it that way, but it's how I do it.  All right?

**MS. SPEARMAN:**  I'm okay with that.

**THE COURT:**  I'm sure you are.

All right?  So does that make sense in terms of peremptory -- and you understand what I'm saying?  You're only going to need to exercise those strikes out of the jurors that we need to seat our jury.

All right.  And so that's about how we will do the jury selection process.  And then we will bring the jurors back up here.  We will excuse those that we do not need.  We will administer the oath and then we will seat the jury and give them new numbers.

Then I will read the introductory instructions to them.  I read 1.10, Nature of the Case; 1.03 -- these are from the Eighth Circuit Pattern Instructions -- 1.03, Evidence; 1.05, Credibility of Witnesses; 1.06(a).  I do permit the jurors to take notes.  I do not permit them to ask questions.

I will tell you, however, that I have modified the Eighth Circuit note-taking section a little bit.  I've added

some language to it.  I wish I could remember where I got that language now, but I don't remember anymore.  But, basically, it advises the jurors that they should not permit their note-taking to keep them from observing the witnesses and the evidence, and that they each have an independent responsibility to remember the evidence.  And they cannot, essentially, cede that responsibility to somebody else who's taking notes.  All right?  So if you all want to see that language, I can show it to you.  But that's, basically, what it says.  And then we will do 1.07, Bench Conferences; 1.08, Conduct of the Jury; 1.09, Outline of the Trial.

Now, you know, when I'm dealing with, kind of, a one-count indictment, or where we have the same charge, I often do give an elements instruction as well.  We've got three different charges here.  I leave it to you all to decide whether you want that, whether you want me to give the jurors a preliminary indication of the elements of each offense before we get started.  And, if so, you need to provide that to me.

**MS. SPEARMAN:**  I prefer not, but I'm open to --

**THE COURT:**  Yeah.  I mean, it's a little hard when we've got three different -- three different charges here.

**MR. WISEMAN:**  I agree.

**THE COURT:**  All right.  So let's not here.  And so I won't do that.

And then -- I don't know -- do you all have any stipulation?  Any stipulation of facts?

**MR. WISEMAN:**  We've talked about stipulations of the evidence.  We've also mentioned stipulation of the third element of wire fraud, the interstate nexus requirement.  And we don't have that in writing yet.  We do expect to have that as a stipulation of fact.  That's the only factual stipulation I'm aware of.

**THE COURT:**  All right.  So, you know, just make sure you get me any stipulations that you have and that you advise me whether you want me to read that stipulation to the jury.  All right?

**MR. WISEMAN:**  Yes, Your Honor.

**THE COURT:**  Either before or after your opening statements.

**MS. SPEARMAN:**  Yes, Your Honor.

**THE COURT:**  Okay?  And then we will do opening statements.  And why don't you tell me how much time you would like and then I will tell you how much time you get.

**MR. CLOW:**  For the Government, Your Honor, I think 10 minutes would be sufficient.

**MS. SPEARMAN:**  10 minutes sounds great, Your Honor.  I was going to say 20, so that makes me happy.  I don't know.  I don't need -- I don't need 20.  I came up in Georgia.  We have short opening statements.

**THE COURT:** Okay. I mean, if you guys want 10, 10 is fine. I mean, I'll give you 15 if you want it.

**MS. SPEARMAN:** Perfect.

**THE COURT:** Which?

**MS. SPEARMAN:** Max 15 in case we're talking slow?

**MR. CLOW:** That's fine. That's fine, Your Honor.

**THE COURT:** All right. So I will give you 15 minutes per side. I don't, you know, put a stopwatch on you for your opening. I will put a stopwatch on you for your closing.

And so then we will do the Government's opening and we will do the defendant's opening unless it is reserved. And I don't mean to tie you down to what you say now, but at this point in time, do you anticipate that you would, in fact, be providing an opening statement at the beginning?

**MS. SPEARMAN:** Yes, Your Honor. I do.

**THE COURT:** All right. And then we will do the Government's case-in-chief and go from there. All right?

So everybody, kind of, understand the process? Any questions about that?

**MR. WISEMAN:** No questions, Your Honor. Thank you.

**THE COURT:** All right. And so just a couple of other housekeeping matters. Let's keep our bench -- yeah.

**MS. SPEARMAN:** Your Honor, I'm sorry. I'm not sure if we're getting to closing yet. But I know you said you put

a stopwatch on us for closing.  What is your preference to limit that to?

        **THE COURT:**  I'm sorry?

        **MS. SPEARMAN:**  What is your preference to limit our closing arguments to?

        **THE COURT:**  Oh, I don't know yet.

        **MS. SPEARMAN:**  Okay.

        **THE COURT:**  We'll see how -- we'll see how all the evidence goes.  I mean --

        **MS. SPEARMAN:**  Okay.  Great.

        **THE COURT:**  -- I need to hear how complicated the evidence is before I can really make a decision about that.

        **MS. SPEARMAN:**  Thank you.

        **THE COURT:**  So as we get closer to closing the case, then we will discuss how long you're going to get for your closing.  All right?

        So, bench conferences, let's keep them to a minimum.  All right?  And, otherwise, you know, you're going to ask your questions at the podium.

        Do we have exhibit lists?  Have they been exchanged?  Are there any objections?

        **MR. WISEMAN:**  We have draft exhibit lists that were produced yesterday.  Also, a draft witness list yesterday.  The finals will be produced no later than next Friday, Your Honor.

THE COURT:  Okay.  But when you say there are drafts, are you saying drafts that you've produced to the defendant?

MR. WISEMAN:  That's correct, Your Honor.

THE COURT:  Okay.

MS. SPEARMAN:  Yes, Your Honor.  And we just got those late last night, so I'm currently pulling all of those to see -- I don't believe that I have any objections to them at this time just from what I've started going through.  But I just got that last night, so if I do have any objections to anything, I'll certainly reach out to Mr. Wiseman first and try to work that out before bringing it to your attention.

THE COURT:  Great.  So let's do try to work that out and let me know.  And any objections need to be filed by Friday, the Friday before trial.  Okay?

MR. WISEMAN:  Sounds good.

MS. SPEARMAN:  Uh-huh.

THE COURT:  And what I would like to know, too, is I'm assuming based upon the motions *in limine* and the response filed by the defendant that the parties have, essentially, stipulated to the admissibility of all those business records?

MS. SPEARMAN:  That's correct, Your Honor.

THE COURT:  All right.  And if there are other exhibits on the Government's exhibit list or the defendant's exhibit list that you all can stipulate to, because the mere

fact that you don't have objections doesn't mean you're not expecting the opposing party to lay the foundation for those exhibits, but if there are other exhibits that you are stipulating to, please let me know that before we get going at trial.  All right?

**MS. SPEARMAN:**  Yes, Your Honor.  We will.

**THE COURT:**  Great.

And you may use exhibits in your opening statement, but only by agreement of the other side.  If you are planning to use any demonstrative or blow-up or anything like that, please make sure that you are showing that to opposing counsel so that there is nothing argumentative on that, that is going to draw an objection and, essentially, prevent you from using what you hoped to use in your opening statement.  All right?

And in terms of exhibits as a whole, just so that I don't forget to tell you, I don't just send all the exhibits back to the jury when they go to deliberate.  Once they go out, I will ask you all to make a pile of your exhibits that have been admitted, show them to opposing counsel so that they are there and available.  And if the jury requests any exhibits, then we will send that exhibit or those exhibits back to them.  All right?

I'm going to ask you at the end of each day to please advise opposing counsel of the witnesses that you expect to call the next day, and, you know, in general, the

order in which you anticipate calling them.  Now, I will tell you that almost all of my trials go more quickly than the parties thought they would.  All right?  And so do make sure that your witnesses are here and available with the assumption that we're moving quickly because I try really, really, really hard to be patient when we do trials.  I like trials.  But the one thing that can get me a little bit testy is if we have to send our jury out for an hour or two because your witnesses aren't here and ready to go.  So don't do that.  Okay?

Make sure -- and I'm sorry if that means that your witnesses may be sitting in there cooling their heels for a little bit, but that's better than having all of our jurors and court personnel all cooling their heels.  All right?

Do we have any audiotapes, videotapes, transcripts of anything that I need to be aware of?

**MR. WISEMAN:**  We do not, Your Honor.

**THE COURT:**  Okay.  Any depositions or evidence from other cases?

**MR. WISEMAN:**  No, Your Honor.

**THE COURT:**  All right.  And so, you know, as I said, look at the introductory instructions that I have told you about.  I will also look at what the Government has filed.

And the other thing is I prefer that you not call witnesses by their first name.  I think there's a certain level of decorum that ought to control in the courtroom.  I'm

not going to control how you address your own client.  That is up to you.  But, obviously, even if the -- even if Ms. Spearman were to address Ms. Bobo by her first name, that would not give the Government leave to do that.  Okay?

And I want you all to start working on your final jury instructions.  All right?  The Government has already filed those.  The deadline for filing objections to those instructions has come and gone.  May I assume from that that the defendant has no objections to the Government's instructions?

**MS. SPEARMAN:**  Your Honor, I've read through them.  I think there's only one that I might prefer a different pattern instruction on.  I just wanted to finalize that.  But I will have that final answer to you by tomorrow morning.

**THE COURT:**  Okay.  So -- and, again, that's something that you can discuss with the Government.

**MS. SPEARMAN:**  Yes, Your Honor.

**THE COURT:**  Because, you know, we're going to start working on those instructions and try to narrow any areas of disagreement and start to get them finalized.  We're going to start that discussion the first day of trial so that, as we go through, we're not -- we're not having to, you know, start afresh or start from ground zero after we have finished our case.

And I do want you to send me your proposed

instructions in Word.  You should e-mail those to Sara.  And if you do that, then we will take the laboring oar of creating the final draft of instructions.  If there are problems with them or you don't send that to us, then you are going to take the laboring oar of preparing that final set of instructions.

And I will tell you that I read the final instructions before your closing.  All right?  So I will read those first.  I will read everything except the final instruction before you do your closing and that's because I want the last word.  But that final instruction, as you know, tells them how to conduct themselves in the jury room when they go back.  It's a good thing to end on.  But the only problem with that is that the verdict form is a part of that instruction as well.  But that does not mean you cannot use that verdict form in your closing.

We will have -- you will have the final set of instructions in your hot little hands before you do your closing, including the verdict form.  And so you may use any of those instructions.  I will have read all but the last one to them.  But if you want to use the verdict form, you don't have to say, I anticipate that the judge may tell you that this is your verdict form.  This will be our verdict form and you can say, This is the verdict form that you are going to get in the jury room and say whatever you want about it.  This is how I want you to mark it up or they proved this or they

didn't prove this or whatever.  All right?

**MS. SPEARMAN:**  Your Honor, what is your position on using technology for attorneys as far as note-taking or reading notes from a laptop or iPad versus physical paper?  Do you have a preference?

**THE COURT:**  Don't care.

**MS. SPEARMAN:**  Great.

**THE COURT:**  Don't care.  You can use technology however you want.  Now, I will want you to, at a minimum, use the courtroom technology to present your exhibits.  And if you don't know how to do that or you need a refresher or you need to make sure that our technology's talking to your technology, then you need to work with it.  Just, you know, talk to staff here before you leave and arrange a time to do that because I will want you to use the visual presenter.  And I don't care whether you pull up documents and use little pop-up screens. That's totally up to you.  But, at a minimum, I will want you to be using the visual presenter as much as possible so that the jury can see those exhibits.

And I'm not really sure how the screens are set up in this courtroom.

**THE CLERK:**  We'll have this one up here and then we'll have a second one just like in your courtroom.

**THE COURT:**  All right.  So the jurors will have this big screen here and then we will also put a smaller one, but

up a little bit higher, on the far side of the jury box so that the jurors can see the evidence as you are discussing it.

**MR. WISEMAN:**  One question on technology, Your Honor.  I'm not saying this is something Ms. Spearman would do, but it's come up in other cases where we've had recording devices, live transcribing.  I think that violates the local rules.  That wouldn't be required -- that would be prohibited in here; is that correct?

**THE COURT:**  Well, yeah.  You -- you can't be recording.

**MS. SPEARMAN:**  That won't even occur to me, Your Honor.

**THE COURT:**  Okay.  Yeah.  You cannot --

**MR. WISEMAN:**  I didn't think it would.  It's come up in --

**THE COURT:**  Neither can anybody else that you all have --

**MR. WISEMAN:**  It's come up in other cases.

**THE COURT:**  -- come into the courtroom.  Recording devices are prohibited whether they are on your phone or on your eyeglasses or anywhere else.  All right?

**MR. WISEMAN:**  Thank you, Your Honor.

**THE COURT:**  And so any questions or problems with respect to the technology?  Can we print -- can we save and print what they have annotated?

THE CLERK:  No.  They have to have, like, a USB in this cart and I don't think it's working right now.

THE COURT:  Okay.  Well, do talk to the tech folks and see if that is possible.

THE CLERK:  Okay.

THE COURT:  All right?  Because, you know, sometimes you can have a witness actually mark up a document and then we can save it and print it.  But sometimes that works and sometimes it doesn't.  All right?

THE CLERK:  I will talk to them.

THE COURT:  Because this is government technology that we have here.  All right?  Okay?

MR. WISEMAN:  Yes, Your Honor.

THE COURT:  All right.  So that is about it in terms of the technology and, you know, how we're going to walk through things.

And I'm not sure I have very much else except do we have any need to make an additional record with respect to settlement offers?  Have there been any further settlement discussions since you last appeared in court?

MS. SPEARMAN:  No, Your Honor.  There have been not. We're just preparing for trial.

THE COURT:  All right.  No.  No.  That's fine.  I just wanted -- if there were, I would want to make a record of them.  And if there isn't, then we already made a record.

All right.  Great.

So one of the next things that I have on my list is forfeiture and how you all want to handle forfeiture. Assuming, but not -- in the event that Ms. Bobo is convicted on any of Counts 1, 2, and 3, how do you all want to proceed with respect to forfeiture?  Do you want to have forfeiture determined by me or is there the, you know, limited question that you want to have presented to the jury?

**MS. SPEARMAN:**  Your Honor, I think that we'd rather have forfeiture decided by you.  I don't think that there's ever been a question in this case whether or not the assets mentioned are related to the New Heights Community Venture.

**THE COURT:**  All right. And it's fine with me.  It's just that if we were going to present that to the jury, that's just something we would need to start working on.

**MS. SPEARMAN:**  I don't think we need a bifurcated trial.

**THE COURT:**  All right.  So in the event that Ms. Bobo is convicted on any of Counts 1, 2, and 3, then we will proceed with respect to forfeiture and we can do that right away or we can set another date for it as you please. All right?

**MS. SPEARMAN:**  Thank you.

**THE COURT:**  And then I don't know that we've got much else.  I've got jury instructions, summary, list of names

*Pretrial Conference*                                              40

forfeiture.  Okay.  So I've got everything on my list.  I think the only other thing that we've got is to start going through the motions *in limine* unless someone has some questions or other issues.

**MR. WISEMAN:**  I'd like to make a quick record on one of the points, Your Honor.  We plan on -- and as I let defense counsel know -- Jencks on Monday.  The final Jencks.

**THE COURT:**  Okay.

**MR. WISEMAN:**  Most of the Jencks has already been produced, but --

**THE COURT:**  On this -- this coming Monday?

**MR. WISEMAN:**  Yes.

**THE COURT:**  Okay.  Great.  And I assume you have adhered to your *Brady* obligations?

**MR. WISEMAN:**  Sorry, Your Honor.  I was reminded of the holiday, so probably Tuesday.

**THE COURT:**  Tuesday.

**MR. WISEMAN:**  Yeah.

**THE COURT:**  All right.  But I assume you have adhered to your *Brady* obligations as well?

**MR. WISEMAN:**  Absolutely.

**THE COURT:**  All right.  And how about reciprocal discovery?  Has any reciprocal discovery been produced?

**MS. SPEARMAN:**  No, Your Honor.  Anything that we intend on using during trial has already been produced as part

of the Government's discovery obligations.  Ms. Bobo produced records early on that were responsive to a subpoena.  We have no additional evidence that we --

THE COURT:  All right.

MS. SPEARMAN:  -- intend on submitting as part of our case-in-chief.

THE COURT:  Great.  Okay.  So are we ready then to proceed with respect to the motions *in limine*?  And I have received the defendant's response to the Government's motion *in limine* and I -- you know, I saw that, with respect to quite a few of them, we don't have any dispute and so that's great and we will be able to move through those very quickly then.

So give me just a moment to lay my hands on that.  Okay.

Okay.  So the first one is motion to admit intrinsic relevant evidence as intrinsic relevant evidence, defendant's failure to report fraud proceeds as income on her federal income tax returns.  I understand that, essentially, the Government will be presenting evidence that no income tax returns were filed for years 2020 through '22; is that correct?

MR. CLOW:  That's correct, Your Honor.

THE COURT:  All right.  And that the defendant agrees?

MS. SPEARMAN:  Yeah, Your Honor.  The case law's --

the Government's case law is correct on that one.

THE COURT:  All right.  And so that one will be granted on the parties' agreement.

The next one is the motion to preclude as irrelevant and prejudicial evidence or argument regarding the USDA COVID-19 Food Program waivers and I understand that the defendant concurs with respect to that as well?

MS. SPEARMAN:  That is correct, Your Honor.

THE COURT:  All right.  So that one will be granted on agreement of the parties.

The next is to preclude the defendant from providing unrebutted false testimony or argument that she did not produce the forged invoices that are charged in Counts 7 and 8.  And this says that Ms. Bobo does not intend to make that -- well, I'm not really sure what you're saying.  It says not to make false testimony or argument at trial.

MS. SPEARMAN:  Your Honor, to the extent that -- we don't intend on fighting the fact that she turned over the materials in the Government's evidence as part of the subpoena response.  However, to the extent that that would be conceding guilt in originally manufacturing those invoices, that's the part that we say is -- that ties our hands in the ability to actually defend Ms. Bobo's status as not guilty or guilty on that charge.

So we concede that, yes, those were the materials

that were turned over as part of the subpoena response materials, but to say -- I'm not fully sure if it was the Government's intent, but it came across as to say that she didn't -- "produce" and "manufacture" might have two different connotations there, Your Honor.  That was my point.  And does that make sense what I'm trying to say?

**THE COURT:**  Well, I'm trying to determine whether we have a controversy here or not.

**MR. WISEMAN:**  It sounds like no, Your Honor.

**THE COURT:**  Okay.

**MR. WISEMAN:**  That's exactly --

**THE COURT:**  I wasn't sure.

**MR. WISEMAN:**  I brought it up to the Court to make sure that we didn't have a mid-trial need to call a former opposing counsel.  And if she is conceding that she is the one who produced these records, I have no need to call former opposing counsel.  I guess without -- with one caveat, Your Honor.  Unless there is no argument that former opposing counsel is the one who created these records.

**MS. SPEARMAN:**  I have no reason to believe that is the argument that's going to be made.

Your Honor, I -- sorry.  I came up from an engineering school.  When I sometimes produce, I just want to make sure it's very clear that, here, we mean -- "produce" specifically means turned over and not produced.

THE COURT: So can we say turned over?

MR. WISEMAN: Absolutely. Yeah.

THE COURT: All right. So that she -- I'm scratching out "produced" and I am writing in "turned over."

Okay. So No. 3 is granted, again, on agreement of the parties.

And then we have No. 4. And No. 4 is a motion *in limine* to preclude the defendant from, essentially, blaming DHSS. And I wasn't sure I totally understood.

MS. SPEARMAN: And, again, Your Honor, here, it's not our intention to say, Well, DHSS has paid it out so that makes it okay. That's not our intention of our argument. However, it does lend credence to Ms. Bobo's subjective belief as to whether or not those claims were permissible, particularly given the fact that they occurred over a substantial period of time.

It also has to do with we intend on discussing the phrasing of the contracts, the interactions that Ms. Bobo had with DHSS representatives. And so we want to make sure that as we are discussing Ms. Bobo's subjective intent here, I don't want it to -- again, I don't want our hands to be bound by just saying, We're not allowed to say that, Well, DHSS did pay out the claims, because that is -- that is a fact of what happened in the case, that DHSS did reimburse Ms. Bobo. So it is important for us to be able to discuss that. That's where

*Pretrial Conference*

the loss amount comes from.

THE COURT:  Any problem with that?  I don't think it's going to be disputed that DHSS paid the claims.

MR. CLOW:  I was going to say, Your Honor, it's part of the evidence that the claims were paid.

THE COURT:  Right.

MR. CLOW:  So I don't think I have a problem with that as long as defense counsel's in agreement that she can't imply her questioning or certainly argue to the jury that the defendant is not guilty because the state paid out these claims or that they were negligent in paying out the claims.

THE COURT:  And I assume there will be no argument that DHSS --

MS. SPEARMAN:  I'm not saying DHSS --

THE COURT:  -- was negligent in paying those claims?

MS. SPEARMAN:  That is not my intent.

THE COURT:  All right.  But that she may argue whatever else was going on in terms of her intent or state of mind that the fact that the claims were paid played into that.

MR. CLOW:  Understood.

THE COURT:  Okay?  All right.  So No. 4 is also granted, you know, with the caveats discussed here.  Okay?

MS. SPEARMAN:  Yes, Your Honor.

THE COURT:  All right.  And so No. 5 is the motion to preclude an advice of counsel defense.  And I understand

that she does not intend to use advice of counsel.  So that one is also granted on agreement of the parties.

And No. 6 is the motion to preclude improper character evidence, including specific instances of uncharged purportedly lawful conduct or good acts.  And it appeared to me that this is one where the parties were not in agreement.

**MS. SPEARMAN:**  That is correct, Your Honor.  We are not in agreement.

**THE COURT:**  All right.  And I have reviewed everything that you all filed with respect to this one.  Is there any argument that either side wishes to offer?  And I will tell you, you know, the Government -- the defendant's response was filed a day late.  I'm not going to knock you for -- and say you've waived your arguments because it was a day late.  But the reason I wanted it earlier is because I knew I was going to be in Cape Girardeau all day yesterday on another case which, therefore, limited my ability to review your response.  I have tried to review it as much as I could given the time constraints, but I assume that also means that the Government may have some response to what you have filed that they have not otherwise filed.

**MR. WISEMAN:**  A very brief response, Your Honor, because we do object to the evidence articulated by the defendant.  The evidence is, I think, clearly articulated on page 4.  They want to admit specific instances of defendant's

good acts as to her service and charitable acts towards children.

Now, that is, specifically, prohibited under Rule 405, Your Honor.  That talks about specific acts of conduct, specific acts of a character trait, in fact, not being admissible unless it's an essential element of the charged offense.  And, of course, it's not an essential element in this case.  We have wire fraud, aggravated identity theft, and we've got obstruction of justice.  Nowhere in there is the character trait of being chartable towards children.  So it's not an essential element, and because it's not an essential element, specific acts of prior charitable conduct is inadmissible plainly under Rule 405.

**MS. SPEARMAN:**  So long as that does not cover the fact that Ms. Bobo has been in the field of charity work for the better part of 35 years and has operated in this space for a significant period of time.  And so when we -- when Ms. Bobo testifies and talks about her understanding of the contracts and saying, Well, it's my understanding of this contract based on my prior experience running this other charitable organization, the contracts look substantially similar, or whatever she may say at trial, but, Your Honor, to say that we're not allowed to talk about any of the other charity work that she's done as a whole, I don't intend on asking her about the time that she saved a kitten from a burning building, but

I do need to be able to ask her about her history working in these spaces for charitable organizations that received state grant money, that received state funding, and be able to discuss that and to put a blanket over -- and to be able to say -- it is also important to be able to say that those other charity organizations did operate lawfully, so, clearly, she did know how to do that.

To hinder our ability to do that with a blanket over all of her history would be -- would be prejudicial to Ms. Bobo and to her defense.  Now, to say that I can't bring up one specific instance, if that's all the Government is trying to prevent, then I don't object to that.

**MR. WISEMAN:**  Well, Your Honor, what she just said, that prior charitable organizations operated lawfully, that is the definition of specific act evidence that's inadmissible. That is, it's specific evidence of a character trait.  That's not an essential element.  So Rule 405 expressly prohibits that.

**MS. SPEARMAN:**  I don't think that's a character trait.  I think that that is something that she has done previously.  And I should say -- I should correct it to say not evidence that it operated lawfully, but testimony from her about prior industry work that she's done because I think that is important for the jury to know that she didn't just wake up one day in 2017 and say, I'm not going start New Heights with

no context to where that came about and to how this whole -- these allegations stemmed from.  I think that is an important background to the case to see where it came from.  And we're happy -- I'm happy to provide additional briefing to the Court on this, Your Honor, but I understand that you are tied up substantially before our trial.

**MR. WISEMAN:**  There's obviously a fine line here, Judge, but I think she can testify that she has worked at charities before.  But where that -- where she crosses that line is where she talks about specific good acts she's done or children she's helped, community members she's served.  And when she crosses that line, that is impermissible character evidence.

**THE COURT:**  Anything further?

**MS. SPEARMAN:**  No, Your Honor.

**THE COURT:**  Pretty comfortable with this one.  All right?  And so Ms. Bobo will be permitted to give a sketch of her background, just as any witness will be permitted to give a sketch of their background.  And, you know, to the extent that she worked at Charity XYZ for 10 years and then she worked at Charity ABC for 3 years thereafter, she's going to be allowed to give a sketch of her background, obviously.

To the extent her work at those charities is somehow relevant to her intent here, I'm going to have to hear what it is you're proposing to say to determine whether or not it is

relevant.  All right?  But to the extent you want to argue that she has engaged throughout her career in, you know, these wonderful charitable events and activities, the answer is no. She cannot do that.  Her character as a charitable person is not at issue here and you will not be able to present that evidence.

If Ms. Bobo wants to call a witness to talk about her honesty, her character for being a law-abiding person, those are issues that are relevant and she may do so.  But she may only do so as referenced in 405(a) by opinion or reputation testimony, in which case the Government would then be able to cross-examine those individual witnesses with specific acts.

I understand that in the briefing, the defendant has argued that 405(b) somehow permits this, but it does not. 405(b) is a very, very narrow exception to what otherwise is permitted or under 404 and 405 and it is -- while honesty, truthfulness, law-abidingness are admissible in a fraud case, 405(b) is only available, which speaks to specific acts, when the person's character or character trait is an essential element of the charge.

That is not the case here.  If, in fact, we were dealing with a libel case and the question was whether or not the person was a liar, that would make character an essential element of the case.  But the fact that Ms. Bobo has done good

works does not preclude her from having committed fraud and it is not an essential element of the case.  Her character as a charitable person is not an essential element of the fraud case.

And so, specific acts -- and she cannot testify that I operated these other five charities and I did so lawfully, because those are her offering specific acts by her; namely, I operated five other charities and I did it lawfully.  That's like saying, I spoke to five other people and I didn't lie to them.

**MS.  SPEARMAN:**  Understood, Your Honor.

**THE COURT:**  All right?  So she cannot do that.  And I'm going to cite the parties to *United States v. Ahmed*, 73 F.4th, 1363, 1384, an Eleventh Circuit case from 2023, as well as *United States v. Hill*, 40 F.3d 164, 169, a Seventh Circuit case from 1994.  And, you know, just in terms of character not being an essential element of a mail or wire fraud case, then the parties can look at *United States v. Rubashkin*, and that is 210 WL 746879, Northern District of Iowa, 2010, which also discusses Eighth Circuit law.

There's also an Eighth Circuit case, *United States v. Gregg*, 451 F.3d 930, 934, which says that character does not constitute an element of a claim or charge unless it alters the rights and liabilities of the parties

under substantive law.  So she may discuss her background.  If something that she did in the past is somehow relevant to her intent here, I would need to hear what that is before I can make a determination whether it will be admissible.

**MS. SPEARMAN:**  Yes, Your Honor.

**THE COURT:**  But she may not discuss her prior charitable acts, her prior charitable work, or the fact that she previously operated these other charitable entities and did so in a lawful manner.  All right?

So 6 is granted.

And then we have 7, the motion to preclude defendant's introduction of self-serving hearsay.  And I understand that the defendant is saying that she does not plan to offer her self-serving statements through government witnesses or other witnesses, but that you just don't want a blanket prohibition at this point because some statement may be necessary to correct a misleading impression or otherwise proper under Rule 106?

**MS. SPEARMAN:**  That's correct, Your Honor.  And much like you just said, we don't know what exactly witnesses -- we never know exactly what a witness is going to say.  Even when we've prepped them ourselves, we never know what they're actually going to say when they take the stand.

**THE COURT:**  All right.  So I am -- yeah.

**MR. CLOW:**  Oh, no.  I was just going to say I don't

think there's a disagreement really here, Your Honor.

**THE COURT:**  All right.  And so I am going to grant No. 7 subject to reconsideration based upon the testimony that is offered.  All right?

And then we have motion *in limine* No. 8 to admit summary evidence.  And I understand that there's no disagreement there, so that will be granted by agreement.

Also, the same with respect to demonstrative exhibits with summary witnesses.  Also granted by agreement.

And then we have No. 10, and those are the bank and public records.  And I understand that is also by agreement; correct?

**MS. SPEARMAN:**  Yes, Your Honor.

**THE COURT:**  All right.  And so I will assume that all of those documents can come into evidence without objection.

No. 11, we've got the motion *in limine* to preclude ignorance of the law or mistake of law.  And this appeared to be another area where there was disagreement.

**MR. WISEMAN:**  Absolutely, Your Honor.  And reading over the defenses response, I'm not exactly sure what evidence they are seeking to admit.  But what here is abundantly clear under the Supreme Court's precedent, knowledge of the law is not required in order to satisfy our elements.  So the knowledge, or lack thereof, of the law is not relevant to the

charged offense, but I don't know exactly what the defendant is saying could make it relevant.

**MS. SPEARMAN:**  Your Honor, it's not so much physical evidence that we intend on introducing when we're discussing about mistake of law or ignorance of the law.  But Ms. Bobo's intent is a critical issue in this case and her intent is critical in, I believe, every element of this case.  And so her ability to testify, not about what she believed was the law, but what she believed was her interpretation of the contracts and she was signing contracts with government entities here.  And so that is critical and is a crux of this case.

So we do not intend on using "I didn't know the definition of wire fraud" as an excuse and we do not intend to argue that she believed that she wasn't committing wire fraud specifically because, frankly, she didn't know what wire fraud was at the time, not in like an educational standpoint.  But it wasn't -- it wasn't her intent to be in this arena.

So it is, though, important that we be able to discuss her mistakes and her ignorance of what specifically was permissible within the confines -- and several of the contracts specifically reference United States Code sections and State of Missouri sections.  And so her ignorance or mistake of what specifically was contained within those subsections of the law that are buried within the contract, we

would like to be able to discuss those.

MR. WISEMAN:  On that point, Your Honor, because I think this is helpful, it is important -- and I think the Court would agree -- it's important that the judge sets forth the law, and there's no confusion on that.  So if there are any legal provisions that are going to be discussed in terms of CFR or United States Code statute provisions, any interpretation of those, I think, would be improper.  I'm sort of surprised to hear that, but I think any -- any interpretation of those would be improper.  I can't fathom what those might be, but it would lead to jury confusion and I think that would be improper in front of the jury.

MS. SPEARMAN:  I'm sorry, Your Honor.  I might have -- that might have come across as confusing.  The Government, I believe, specifically references in the indictment and in some of their evidence that the contracts bind her to follow certain United States Codes, so her -- my point there is not that those code sections are buried so far within the contracts, I would like to be able to identify that as part of the evidence and that it is not -- that a layperson or a person operating in this field would not necessarily go to those code sections to read them.  So I'm not trying to interpret those code sections.  I'm not trying to cite those code sections.  But I believe that's part of the Government's indictment is that -- and in the extensive factual basis, that

she's bound to follow those specific code sections as well.

And so, again, I'm not --

**THE COURT:**  But if she is bound to follow those code sections and she chose not to look at them, that does not provide a defense to her.

**MS. SPEARMAN:**  Her intent to follow the contract is the point that I intend to argue, Your Honor, is the contract itself, not the interpretation of those code sections.  I don't intend on -- I don't intend on blowing up the code sections or presenting those to the jury in any fashion or interpreting those code sections that she was bound to follow in any fashion.

**MR. WISEMAN:**  As I understand, Your Honor, I think as long as we're not talking about CFR code cites or United States Code cites or the defendant's interpretation of the law, I think -- I think we're in agreement on it.  But I want to make sure we are, that is the understanding.

**MS. SPEARMAN:**  I think we are.

**MR. WISEMAN:**  Okay.

**THE COURT:**  All right.  I think we're okay as well. But just to make a clear record based upon what was filed, I do just want to just make a record that I do not believe that the *Rehaif* case that was cited by the defendant in her response has any application here.  And so I do believe that it is, in fact, still that mistake of law is not a defense to

wire fraud.  And what's different about the *Rehaif* case is the *Rehaif* case was not talking about intentional conduct.  The *Rehaif* case was interpreting knowledge.  And someone had to have knowledge of, for instance, their status as an alien before they could be held to have violated 922.  And that is not what we're talking about here.

Knowledge is not the state -- the scienter under this statute.  It's intend to defraud.  And so I don't believe that the *Rehaif* case has any application because that dealt with whether the mistake negated the knowledge that was required to establish some material element of the charge of the offense, and that is not the case here.  And so what is at issue here is was a statement made and did -- was it knowingly false.  All right?  That's what the Government has to prove.  So I just don't believe that it has any application.

And, again, I cite the parties to *United States v. Hungerford*, H-U-N-G-E-R-F-O-R-D, 2023 WL 8179273 at page 8.  That's a Fifth Circuit case from 2023.  And it says that a jury instruction that states mistake of law is not a defense to mail and wire fraud is, in fact, acceptable and was looking at *Rehaif* in that context.  There are other cases, including the *Blagojevich* case from the Seventh Circuit and many others.  So the Government only has to prove that the defendant had the intent to deceive and knowledge of the law is not a defense.

Now, I gather from what's been said here that you all think that you have reached some meeting of the minds in terms of what the defendant may be arguing here.  You may understand that better than I do at this point.  But I am going to assume that you all have found some middle ground where you are in agreement.  Is that fair?

**MS. SPEARMAN:**  I think so.

**MR. WISEMAN:**  I think it's fair for now, Your Honor.  And, obviously, we can take it up during the trial if we think there's not.

**THE COURT:**  All right.  So I am granting that motion as well.  And, you know, to the extent that her understanding of contracts and other things is relevant to her intent to defraud, it sounds as though the Government does not have a problem with her talking about what she thought the contract required.

**MR. WISEMAN:**  That's correct.

**THE COURT:**  All right.  So, next is No. 12, potential penalties.  And I understand the defendant has agreed to that, so that is --

**MS. SPEARMAN:**  That's correct.

**THE COURT:**  -- granted by agreement of the parties.  Same with respect to No. 13, with respect to any arguments of vindictive or selective prosecution.

And then we have No. 14, impermissible arguments

regarding missing witnesses.  If I understand what the parties have said here, it sounds like that is something that I can grant, in general, subject to the defendant identifying that it is, in fact, proper to make such comment based upon what develops as we go through the trial.

**MS. SPEARMAN:**  Perfect.  Thank you, Your Honor.

**MR. WISEMAN:**  Thank you, Your Honor.

**THE COURT:**  All right.  Good.

And then No. 15, again, the defendant agrees to that.  That is to exclude evidence not produced in reciprocal discovery.  And I understand that Defendant has produced everything that she intends to use, and anything else that wasn't produced will, in fact, not come in based upon No. 15, which I am granting by agreement.

And then No. 16, the motion to permit introduction of defendant's e-mail records.  I understand, again, that the defendant agrees with that and that will be granted by agreement of the parties.

**MS. SPEARMAN:**  That's correct, Your Honor.

**THE COURT:**  All right.  So does that deal with all of the motions *in limine*?

**MR. WISEMAN:**  It does, Your Honor.

**MS. SPEARMAN:**  Yes, Your Honor.

**THE COURT:**  All right.  Anything else that we need to take up?

MR. WISEMAN:  No, Your Honor.  Thank you.

MS. SPEARMAN:  No, Your Honor.

THE COURT:  All right.  So I think we are ready to go.  If you all need me with respect to any change in developments with regard to this case, please make sure that you contact me tomorrow because I can be here in the afternoon if there is a reason for that.  You should assume that we will begin the trial on Tuesday.

I will need to receive from you the Friday before our trial the few items that we have discussed including a summary of the case, a list of the names that the prospective jurors may here, as well as any objections to any jury instructions and the filing of any proposed voir dire questions that you reasonably anticipate might draw an objection from opposing counsel.  All right?

And then make sure you give me your jury instructions on Word, that you send those to Sara.  All right?  Anything else?

MR. WISEMAN:  No, Your Honor.  Thank you.

MS. SPEARMAN:  No, Your Honor.  Thank you.

THE COURT:  All right.  Ms. Bobo, do you have any questions?

THE DEFENDANT:  No, ma'am.

THE COURT:  All right.  So what will happen then, ma'am, is that you will be returned to the custody of the

United States Marshal, and then you are next expected to be here a week from Tuesday when we will begin this trial.

I need everybody here at 8:30.  I understand that you will be -- Ms. Spearman, that you will be providing clothing for Ms. Bobo and then Ms. Bobo will only be restrained with leg restraints.  She will be at that table. We will have curtains around the tables.  And then, you know, should she choose to testify, we will make sure that no restraints are visible to the jury.

**MS. SPEARMAN:**  Thank you.

Your Honor, a silly question.  What's your policy on drinking water in the courtroom?  I know sometimes --

**THE COURT:**  I think everybody should drink water in the courtroom.  All right?  So you can either bring that in, in a cup, or you can have little bottles.

Don't we have pitchers?

**THE CLERK:**  They took them away during COVID.

**THE COURT:**  They took away the water pitchers.  Oh, my goodness.  We used to have --

**MS. SPEARMAN:**  I'm happy to bring in water.  I just -- some judges are very against it, so just I like to ask before I --

**THE COURT:**  Oh, no.  No.  Bring water.  You know, for the first day of trial, you should bring yourself some snacks because, depending upon how long you guys take to pick

your jury, you may need to be snacking instead of eating lunch on the first day of trial, so do bring some snacks to eat on Tuesday because I will give you time for lunch if we have it. But if you all take a really long time to do your jury selection, then I'm not going to leave all of those jurors sitting out there forever.  And then I'm going to give you just about a 10-minute break.  So do think about bringing snacks.  You're welcome to eat them here in the courtroom or out in the lobby.

**MS. SPEARMAN:**  Thank you.

**THE COURT:**  All right?

Okay.  Anything further?

**MS. SPEARMAN:**  Nothing further, Your Honor.

**THE COURT:**  All right.  Then we'll be adjourned on this matter.  Thank you.

**MR. WISEMAN:**  Thank you, Your Honor.

**(The proceedings concluded at 3:01 p.m.)**

CERTIFICATE


I, Carla M. Klaustermeier, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 62 inclusive and was delivered electronically and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 14th day of October, 2025.


/s/ Carla M. Klaustermeier
Carla M. Klaustermeier, RMR, CCR, CRC, CRR
Official Court Reporter